## DE GREAYER v. FIDELITY AND CASUALTY COMPANY OF NEW YORK.

### S. F. No. 1417; September 15, 1899.

#### 58 Pac. 390.

**Insurance — Voluntary Exposure — Evidence.—** Deceased was overtaken by a policeman while driving, and, in an altercation which ensued, the policeman shot and killed him. After deceased was shot, he fired his pistol at the policeman, but there was no positive evidence that he took the pistol from his pocket until he was shot. His pistol had a white handle, and one witness testified that before the shooting he saw deceased take something from his pocket and threaten to kill the policeman, while another testified that deceased went toward the policeman, unbuttoning his overcoat with his left hand, and that he raised his right when close to him, saying, "You will not stop my horse," and had nothing in his hand that witness could see; that after deceased was shot, and had fired at the policeman, witness saw something white in his hand. Held, that it was not an abuse of the trial court's discretion to refuse to set aside a verdict finding that deceased had not voluntarily exposed himself to unnecessary danger, within the exception of a policy.[1]

**Insurance—Voluntary Exposure to Danger.—** In an Action on a Policy excepting from its operation death by voluntary exposure

---

[1] Cited in the note in 139 Am. St. Rep. 702, on voluntary exposure to danger in accident insurance cases.

to unnecessary danger, an instruction that whether the assured so exposed himself did not depend on his having exercised reasonable care or caution, or that he had been guilty of negligence or unlawful acts, but whether he voluntarily exposed himself to unnecessary danger, and death resulted in consequence thereof, is not erroneous, as misleading or confusing.

APPEAL from Superior Court, City and County of San Francisco.

Action by Harry G. De Greayer, by Septimus De Greayer, his guardian, against the Fidelity and Casualty Company of New York. From a judgment in favor of plaintiff and from an order denying a new trial defendant appeals. Affirmed.

S. C. Pardee for appellant; Parker & Eells and A. G. Eells for respondent.

HAYNES, C.—The plaintiff brought suit by his guardian to recover from the defendant $5,000 the principal sum of a policy of insurance against death from bodily injuries sustained through external, violent and accidental means, issued to one Harry De Greayer, in which the plaintiff was named as the beneficiary. Said policy contained the exception that it did not cover ''voluntary exposure to unnecessary danger,'' and the defendant pleaded and relied upon that exception as a defense to the action. A jury trial was had, and a verdict returned for the plaintiff. From the judgment entered thereon and from an order denying a new trial the defendant appeals.

1. Appellant's principal contention is that the evidence does not justify the verdict. The general rule that where the evidence is conflicting the verdict will not be disturbed, is conceded, but it is contended that there is no conflict in the evidence. It is true that all the witnesses called to testify to the circumstances under which De Greayer was killed were called by the defendant, but that fact is not conclusive upon the question of conflict. Many a case has been lost because of differences between a party's own witnesses. Here, however, the defense was based upon an exception in the policy, and the burden of proof was upon the defendant. Under the general provisions of the policy, the defendant's liability is conceded, and it could be relieved from liability only by establishing its special defense by satisfactory evidence—that

evidence which ordinarily produces moral certainty or conviction in an unprejudiced mind: Code Civ. Proc., sec. 1835.

De Greayer died from the effect of a pistol shot at the hands of a mounted park policeman named Harper. The homicide occurred about 5 o'clock in the afternoon of January 30, 1892. De Greayer, accompanied by a lady, had been driving in the park, and at the hour named left the main driveway, and was going to the north exit, near the terminus of the car lines, and about opposite Dickey's saloon. Two witnesses were called by the defendant, who witnessed the shooting. One (Rev. O. C. Miller) testified: That he had been walking with his wife in the park, and was also near said north exit, when he heard the swift gallop of the policeman's horse to overtake the buggy driven by De Greayer, and saw him overtake it and seize De Greayer's lines near the bridle and stop his horse. That De Greayer jumped out of his buggy, and, as he was passing round his horse toward the policeman, he "threw up his hand this way [the witness put his hand to his breast]—as I would suppose, to unbutton his coat. Then he went closer to the policeman, and I saw him raise his hand up this way [showing], and he said, 'You will not stop my horse,' and then there was a flash of a pistol, and that flash was down toward the vest of the gentleman, and the gentleman fell or sunk down to the ground, on one knee." That the lady screamed, and the horse turned and ran with the buggy back into the park, and the policeman turned and pursued the horse and buggy, and as he pursued it the gentleman fired one or two shots at the policemtn. That, when the gentleman got out of his buggy and stepped toward the policeman, he had nothing in his hand that he (the witness) could see. That while he was unbuttoning his overcoat with his left hand his right hand went up "this way" (showing). That his manner was excited and threatening. The witness was asked whether he saw anything in De Greayer's hand when he shot at the policeman as he pursued the runaway horse, and he replied: "It was getting toward dark, and I only saw something white. It might have been his cuff. I cannot say as to that." Upon cross-examination this witness drew a diagram upon the blackboard showing the roads and the relative position of himself and the other parties at the time of the shooting; but, as the dia-

gram is not reproduced in the record, we are not aided by it, however much it may have aided the court and jury in understanding and weighing, not only his testimony, but that of the other witness who was called by the defendant to testify to the same circumstances. It does appear from his testimony, however, that the shooting occurred in the park somewhere between the main driveway and the exit, and that this witness could not have been far from the point where it occurred. Alexander McCord, the other witness to the shooting, was at the time on the platform of Dickey's saloon, nearly opposite the exit from the park, and the full width of the street—eighty feet—from it. He testified in chief as follows: "He [De Greayer] jumped out of his buggy, and when he got halfway from his horse he unbuttoned his coat. He had a long ulster on, and he pulled his coat open and put his hand back in his pocket here [showing], and pulled something out. I then thought it was a pocket handkerchief. It was something white. And he made the remark, 'Damn you! I will kill you.' He went right up to the policeman. The policeman's horse backed from him—I don't know whether the policeman pulled his horse away—and he put his hand up to him like that. [The witness raised his right arm.] Then I heard two reports; a pistol go off twice—what I supposed was a pistol go off twice; and as the pistol went off the woman screamed, and the horse turned around and went back into the park. The policeman turned quickly and rode right after her and the buggy, and as he did so De Greayer went down on his hands and knees, and as he got up he pulled his pistol out and fired, I think twice, after him, and that is all I saw, and then I left." Upon cross-examination he admitted that he did not testify upon the examination of Harper before the police magistrate that De Greayer said, "I will kill you," but explained that he was not asked to make a statement, but was only asked questions; that De Greayer might have said, "I will not let you stop my horse," but that would not make any impression on his mind; that, at the time the policeman fired, "De Greayer was right up close to the policeman when the first shot took place—maybe two inches, or maybe four, but very close to him. He was right beside of his horse." It was shown that De Greayer had a white-handled pistol, and that one chamber had been discharged. There was evidence tending to prove that De

Greayer was not in the habit of carrying a pistol; that a short time before he was out driving, and saw a horse badly injured in a runaway, and no one had anything to kill him with; that he was a member of the society for the prevention of cruelty to animals, and carried a pistol for the purpose above indicated. Septimus De Greayer testified that deceased carried his time-book and his pocket handkerchief in his hip pocket, and invariably carried cards in his hip pocket.

The point of the controversy upon the evidence was whether De Greayer assaulted the policeman with his pistol. Upon this question there was no positive evidence that he took the pistol out of his pocket until after he was shot, when, according to the testimony of McCord, De Greayer, when he was shot, went down on his hands and knees, "and as he got up he pulled his pistol out and fired, I think twice, after him." True, he afterward said that as De Greayer passed around the head of his horse when he saw his hand in his pocket, and when he could see the white object, that he could not tell then whether the white object was a pocket handkerchief or a pistol, but it was not cards; it was too large for that, too much of it, and it did not look like cards. The facts were submitted to the jury under full and proper instructions, directing them to take into consideration all the facts and circumstances of the case, and whether the deceased did or did not, at the time he approached the policeman, exhibit or have in his hands a pistol. The jury saw and heard the witnesses, and knew better than we possibly can the weight that should be given to their evidence. There was not only a direct conflict in their evidence as to what De Greayer said, but Miller, who was much nearer, saw nothing in De Greayer's hand until after he was shot, while McCord says De Greayer, "as he got up, pulled out his pistol and fired." We think the jury were justified in failing to find that De Greayer assaulted the policeman with a pistol, and thereby voluntarily exposed himself to unnecessary danger, within the meaning of the exception in the policy, the burden being upon the defendant to prove that fact affirmatively. The learned judge before whom the cause was tried has a much larger discretion in setting aside verdicts than is given to appellate courts, and the real question in this court is whether he abused his discretion in refusing a new trial upon the ground

above considered. A doubt on our part, even if entertained, would not justify a reversal.

2. The only other question noticed in appellant's brief is an exception to the following instruction, given to the jury at plaintiff's request: "The question of whether the circumstances of a particular accident bring it within one of the exceptions by which the company has guarded itself against an accident resulting from voluntary exposure to unnecessary danger is not a question whether the person insured has exercised reasonable care or caution, nor whether he has been guilty of negligence or of unlawful acts, but it is a question whether or not the insurance company has shown—the burden being upon it to do so—that the insured voluntarily exposed himself to unnecessary danger, and that the death resulted in consequence thereof." I see no error in this instruction. It is said by counsel for appellant that it is misleading and confusing; that, while it is true that "voluntary exposure to unnecessary danger is more than negligence," yet the decisions do not hold that it is not negligence. Counsel refutes his own criticism of this instruction when he says that "voluntary exposure to unnecessary danger is more than negligence." In other instructions, to which no objection is urged, the court fully and clearly informed the jury what the words "voluntary exposure to unnecessary danger," as used in the policy, mean. I advise that the judgment and order appealed from be affirmed.

We concur: Chipman, C.; Cooper, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are affirmed.